IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13-20289 |
| | ) | |
| v. | ) | |
| | ) | |
| Francisco Valtierra Zuniga, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO SUPPRESS

Before the Court are Defendant Francisco Valtierra Zuniga's ("Zuniga") January 24, 2014 Motion to Suppress Fruits of July 2, 2013 Traffic Stop ("Motion to Suppress"), the Magistrate Judge's May 14, 2014 Report and Recommendation (the "Report"), and Zuniga's June 3, 2014 Objections to the Report & Recommendation (the "Objections"). (Mot. Suppress, ECF No. 240; Report, ECF No. 325; Objections, ECF No. 350.) The United States of America (the "Government") responded to the Objections on June 17, 2014. (Resp., ECF No. 358.) Zuniga objects to the Magistrate Judge's recommendation that the Court deny Zuniga's Motion to Suppress. Having reviewed Zuniga's Objections, the Court OVERRULES them and ADOPTS the Report of the Magistrate Judge. Zuniga's Motion to Suppress is DENIED.

I. **Procedural and Factual Background**

On March 31, 2014, the Magistrate Judge held an evidentiary hearing on Zuniga's Motion to Suppress. (ECF No. 314.) The Government called two witnesses: Shelby County Sheriff Officer Jason Bartlett ("Officer Bartlett"), and Arkansas State Police Trooper Trenton Behnke ("Trooper Behnke"). (Report at 2.) The Government introduced fourteen exhibits: Exhibits 1-13 are photographs taken of Zuniga, the truck he was driving at the time of the traffic stop, the contents of the truck including an external fuel tank, and the search that led to the seizure of $217,324.00 in cash from the external fuel tank. (Id.) Exhibit 14 is Trooper Behnke's July 2, 2013 Incident Report. (Id.) Zuniga was at the hearing and provided with two translators. (Id.) The defense did not call any witnesses or introduce any exhibits. (Id.)

The Magistrate Judge made the following findings of fact. At the hearing, Officer Bartlett testified that the Federal Bureau of Investigation's ("FBI") Organized Crime and Drug Enforcement Task Force ("OCDETF") received a tip from a confidential informant ("CI") that Osiel Lopez-Acuna ("Lopez-Acuna") was trafficking drugs in the Memphis area. (Id. at 3.) After receiving the CI's tip, officers applied for and obtained permission to place two Title III wiretaps on Lopez-Acuna's cell phone. (Id. at 4.) Officer Bartlett organized surveillance and

communication between the officers who surveilled Lopez-Acuna via the wiretaps and officers on the street. (Id. at 3.)

On or about July 2, 2013, the FBI intercepted Lopez-Acuna's phone calls. (Id. at 4.) Agents determined that an eight-kilogram shipment of powder cocaine had arrived in Memphis the week earlier. (Id.) Lopez-Acuna did not use the words "drugs," "cocaine," or "narcotics" during the phone calls, but the agents determined the use of the word "sheetrock" meant cocaine. (Id.)

Agents conducted visual surveillance on Lopez-Acuna and another co-defendant, David Martinez ("Martinez"). (Id.) Lopez-Acuna and Martinez went to a residence at 1044 Sandra Road, Memphis, Tennessee (the "Sandra residence"). (Id.) The Memphis Police Department provided aerial surveillance of the Sandra residence. (Id.) Agents suspected that a load vehicle was present at the Sandra residence to transport drugs or money. (Id.) There were two vehicles registered to the homeowner parked in front of the Sandra residence. (Id.) Officer Bartlett testified that the agents did not believe they were the load vehicles, because drug traffickers usually use vehicles registered to an out-of-state non-resident as load vehicles. (Id.) Aerial surveillance revealed that a white Ford F-250 truck with out-of-state tags was parked behind the Sandra residence. (Id. at 5.)

In a phone call the agents intercepted, Lopez-Acuna instructed Martinez to load the truck. (Id.) At 3:00 A.M. on July 2, 2013, agents saw the white truck leave the Sandra residence. (Id.) Two FBI vehicles followed the truck. (Id.) Officer Bartlett testified that he was in the secondary vehicle and remained a quarter mile behind the truck. (Id.) The primary vehicle maintained a close distance to observe the truck and its occupant. (Id.) The agents in the primary vehicle saw that there was only one occupant in the truck, but did not recognize Zuniga as the driver. (Id.)

When the truck got on to Interstate-40 heading west toward Little Rock, Arkansas, Officer Bartlett testified that he called Trooper Behnke and asked for assistance. (Id.) Before July 2, 2013, Officer Bartlett had contacted Trooper Behnke to request his help should the suspected load vehicle travel through Arkansas. (Id.) Officer Bartlett testified that he asked for Trooper Behnke so the FBI long-term investigation was not disrupted. (Id. at 6.) The FBI and Officer Bartlett did not participate in the traffic stop and did not have any contact with Zuniga. (Id.)

Officer Bartlett testified that he had worked with Trooper Behnke on two or three prior occasions. (Id. at 6.) Each of those occasions led to a successful traffic stop. (Id.) Officer Bartlett testified that he always instructed Trooper

4

Behnke to develop his own probable cause to stop a vehicle under investigation. (Id.) Officer Bartlett testified on cross-examination that, in his experience, Trooper Behnke was always successful in developing his own probable cause. (Id. at n.2.) Officer Bartlett testified that he gave Trooper Behnke that instruction the morning of July 2, 2013. (Id.)

Trooper Behnke testified that he drives a marked unit with police lights and travels with a patrol dog, Major ("Major"). (Id. at 7.) Major is a narcotics dog that Trooper Behnke has worked with for five (5) years. (Id.) Major is certified annually through a day-long test. (Id.) Major was certified on July 2, 2013. (Id.)

Trooper Behnke testified that he received Officer Bartlett's phone call at approximately 3:00 A.M. on July 2, 2013. (Id.) Officer Bartlett gave him a description of the white truck and its license plate number. (Id.) Trooper Behnke and Officer Bartlett agreed that Trooper Behnke would wait at mile-marker 183 on Interstate-40, near Forrest City, Arkansas. (Id.) Trooper Behnke was scheduled to go on duty at 6:00 A.M. that day, but went on duty at 4:00 A.M. to assist the FBI. (Id.) Between 3:00 A.M. and 4:50 A.M. when he arrived at mile-marker 183, Trooper Behnke received periodic updates of the white truck's location from the FBI. (Id.) When he arrived at

mile-marker 183, Trooper Behnke positioned his vehicle parallel to traffic. (Id. at 7-8.)

Trooper Behnke testified that he observed the white truck pass between 4:55 A.M. and 5:00 A.M. and occupy two lanes at once. (Id. at 8.) Trooper Behnke testified that that action violated Arkansas' careless and prohibited driving statute. (Id.) Trooper Behnke testified that he pulled out behind the truck and caught up to it to verify that the license plate number matched the one Officer Bartlett had provided, which it did. (Id.) Trooper Behnke then observed Zuniga drive outside the fog line, in violation of the careless and prohibited driving statute. (Id.) Officer Bartlett testified that he did not see either of the traffic violations. (Id.)

Trooper Behnke cited Arkansas Code Annotated § 27-51-304 as the relevant statute that Zuniga violated twice. (Id.) The Magistrate Judge found that that statute is the "Careless Driving" statute, Arkansas Code Annotated § 27-15-104, which prohibits "improper lane changes and careless driving." (Id. at n.3.)

After witnessing the two traffic violations, Trooper Behnke activated his blue lights. (Id.) Zuniga drove another half mile before stopping. (Id.) Trooper Behnke testified that nothing prevented Zuniga from pulling over immediately. (Id. at 8-9.)

On cross-examination, Trooper Behnke testified that there is a video camera in his car that activates when his blue lights are turned on. (Id. at 9.) Trooper Behnke testified that the video would not have shown Zuniga occupying two lanes because his blue lights were not on. (Id.) He did not know whether the video would show Zuniga crossing the fog line. (Id.)

When Trooper Behnke exited his vehicle, he walked along the passenger side of the truck and looked into the truck bed. (Id.) He saw an external fuel tank, a generator, a ladder, and a toolbox that was bolted to the truck in the truck bed. (Id.) When Zuniga rolled down the window, Trooper Behnke informed him of his traffic violations and asked for his driver's license and proof of insurance. (Id.) Zuniga only handed Trooper Behnke his proof of insurance. (Id.) Trooper Behnke testified that Zuniga's hand was shaking to the point that he almost dropped the paper. (Id.) Zuniga's proof of insurance had been issued in Dallas, Texas, two days before. (Id.)

Trooper Behnke asked for Zuniga's driver's license again, and Zuniga handed him a Mexican driver's license. (Id.) The license was issued in the name of Fabian Avila Prieto and pictured Zuniga. (Id. at 9-10.) Trooper Behnke asked Zuniga if he were in the country illegally, and Zuniga responded that he was. (Id. at 10.) Trooper Behnke testified that the traffic stop became an investigation of Zuniga's driving without a

license, because it was illegal for Zuniga to drive a vehicle in Arkansas as an illegal immigrant. (Id.)

On cross-examination, defense counsel asked Trooper Behnke if he ran Zuniga's license to verify that it was valid or to find out if he were an illegal alien. (Id.) Trooper Behnke testified that he did not need to run Zuniga's license because Zuniga admitted he was an illegal alien. (Id.) Defense counsel asked Trooper Behnke why he did not call Immigration and Customs Enforcement ("ICE"). (Id.) Trooper Behnke testified that reporting Zuniga to ICE was not his job, which was to ensure highway safety. (Id.)

Trooper Behnke testified that, after he learned Zuniga was an illegal alien, he asked Zuniga to step out of the truck. (Id.) Without being asked to do so, Zuniga put his hands behind his back and turned around in an arrest position. (Id.) Trooper Behnke testified that he told Zuniga to turn around so they could continue to talk. (Id.) Trooper Behnke asked Zuniga where he was coming from. (Id. at 10-11.) Zuniga initially responded that he was coming from Arkansas, but corrected that to Memphis. (Id. at 11.) Trooper Behnke testified that Zuniga explained that he did sheetrock work in Memphis and was driving to Texas to see his family for the Fourth of July. (Id.) Trooper Behnke testified that he was suspicious of Zuniga's answers because he knew Zuniga was coming from Memphis, not

Arkansas as he had originally stated. (Id.) He was also suspicious because the tools in the bed of Zuniga's truck were not consistent with sheetrock work. (Id.) Trooper Behnke testified that there were no mud buckets, sprays, sheetrock tapes, or nozzles used to spray sheetrock. (Id.) Trooper Behnke also testified that Zuniga's hands appeared to be smooth and uncalloused, which was inconsistent with the hands of sheetrockers Trooper Behnke had encountered. (Id.) Trooper Behnke testified that he was also suspicious because Zuniga's proof of insurance had been issued two days before in Dallas, Texas, meaning that Zuniga would have been in Memphis for a day before he drove back to Texas. (Id.) Trooper Behnke testified that the totality of the circumstances made him suspicious. (Id. at 11-12.)

On cross-examination, defense counsel asked Trooper Behnke how he was familiar with sheetrock work. (Id. at n.5.) Trooper Behnke testified that it is his experience that people who do manual labor have rough, calloused hands. (Id.) Trooper Behnke admitted that if a person had only been doing construction work for a brief time, his hands would be less rough. (Id.)

Trooper Behnke testified that all of his interactions with Zuniga took place in English. (Id. at 12.) He testified that he did not ask whether Zuniga could speak English, but based on Zuniga's responses, he believed Zuniga could speak and

understand English.  (Id.)  Trooper Behnke testified that he recalled Zuniga stating that his English was not good, but that Zuniga appeared to understand their conversations and never said he did not understand.  (Id.)

Trooper Behnke asked Zuniga whether he had any large sums of money, drugs, or dead bodies in the truck.  (Id.)  Zuniga glanced at the back of the truck and said no.  (Id.)  Trooper Behnke asked Zuniga's consent to search the truck, and Zuniga verbally agreed.  (Id.)  Trooper Behnke testified that Zuniga stood thirty (30) or forty (40) feet from the truck while Trooper Behnke led Major around the truck for a drug detection test.  (Id.)  Major exhibited a profound alert near the gas tank of the truck and attempted to jump into the bed of the truck. (Id.)  Trooper Behnke testified that the profound alert was a sudden change in Major's behavior, which Trooper Behnke had been trained to detect.  (Id.)  Trooper Behnke told Zuniga that Major had alerted and that he would be searching the areas to which Major alerted.  (Id. at 12-13.)

Trooper Behnke first examined the toolbox attached to the bed of the truck.  (Id. at 13.)  He testified that drug traffickers commonly use such toolboxes for concealment.  (Id.) Trooper Behnke testified that the toolbox was bolted to the truck bed, so he looked to see if the bolts were heavily used. (Id.)  Trooper Behnke testified that he found a ratchet and a

socket that fit the bolts of the toolbox. (Id.) He testified that the bolts had been heavily tooled, indicating that they had been removed and replaced many times. (Id.) Trooper Behnke removed the toolbox, which rested on the L-shaped external fuel tank. (Id.)

Trooper Behnke next examined the external fuel tank. (Id.) He testified that he measured an inch of fuel in the tank. (Id.) Trooper used a density meter to detect whether the density readings inside the tank were consistent with one inch of fuel. (Id.) Trooper Behnke testified that the L-part of the tank had a density reading of between seventy five (75) and eighty two (82). (Id.) Trooper Behnke testified that those readings were too high given the level of fuel in the tank. (Id. at 13-14.) The other areas of the tank had a density reading of between twenty (20) and twenty two (22). (Id. at 14.) Trooper Behnke testified that the readings indicated that there was something in the tank that should not have been there. (Id.) He testified that he drilled a hole into the top of the fuel tank. (Id.) Trooper Behnke testified that instead of one sheet of steel, his drill hit two sheets of steel. (Id.) Trooper Behnke testified that there should have been only one sheet of steel. (Id.) After drilling the hole, Trooper Behnke testified that he used a fiber-optic scope to look into the tank. (Id.) He testified that he saw cellophane and suspected

11

that there was money wrapped in it. (Id.) Trooper Behnke testified that he did not know at that time if the cellophane conatined money, narcotics, or weapons. (Id.)

On cross-examination, defense counsel asked Trooper Behnke about the accuracy of the density meter's readings. (Id. at 13 n.7.) Trooper Behnke testified that he could self-calibrate the meter and that he knew when it needed to be calibrated based on whether it gave abnormal readings. (Id.) He testified that he had used the meter since 2007, and that it had been repaired on a couple of occasions when he determined it was not functioning properly. (Id.) Trooper Behnke testified that the density meter had been repaired last in 2010. (Id.) He testified that the density meter was working properly on July 2, 2013. (Id.) The Magistrate Judge found that Trooper Behnke's testimony was credible about his familiarity with the density meter and whether it was functioning properly. (Id.)

After seeing the cellophane in the tank, Trooper Behnke testified that he advised Zuniga he was being detained and placed him in handcuffs. (Id. at 14.) A local police department unit arrived to take Zuniga to the Lonoke County Detention Center. (Id.) Trooper Behnke testified that the total length of the traffic stop was about thirty (30) minutes. (Id.)

Trooper Behnke testified that he arranged for the truck to be towed to a nearby garage to examine the external fuel tank. (Id.) He testified that at the garage he unbolted the external fuel tank and noticed that the bolts were also heavily tooled. (Id.) After removing the tank from the truck bed, Trooper Behnke testified that he found a hole covered with black tape at the bottom of the tank. (Id.) He testified that when he removed the tape, he found twenty-two (22) packages of U.S. currency wrapped in cellophane. (Id.) The total amount was $217,324.00. (Id. at 15.) Trooper Behnke was not present when the currency was unwrapped or counted. (Id.)

Trooper Behnke testified that he went to Lonoke County Detention Center after finding the money. (Id.) He testified that he informed Zuniga that the money in the tank had been seized, filled out forfeiture paperwork, and advised Zuniga that he was free to go. (Id.) Trooper Behnke testified that he consulted with the FBI, and was told to let Zuniga go without pressing charges. (Id.)

Trooper Behnke's incident report does not mention his contact with Officer Bartlett or the FBI. (Id. at 16.) Trooper Behnke testified that is because he stopped Zuniga based solely on Zuniga's two traffic violations. (Id.) He testified that, after he had stopped Zuniga, he discovered the additional

violation of driving without a license in violation of Arkansas Annotated Code § 27-16-601. (Id.)

On September 5, 2013, Zuniga and fifteen other defendants were initially indicted. (Indictment, ECF No. 3.) Zuniga was subsequently named in the first superseding indictment for conspiracy to possess and distribute in excess of five (5) kilograms of cocaine in violation of 21 U.S.C. § 846. (Supersed. Indictment, ECF No. 154.)

## II. Standard of Review

"A district judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). After reviewing the evidence, the court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). Failure to object to a report and recommendation waives a party's right to de novo review. Fed. R. Crim. Pro. 59(b)(2). The district court should adopt the findings and rulings of the magistrate judge to which no specific objection is filed. Thomas v. Arn, 474 U.S. 140, 150 (1985).[1]

---

[1] The Sixth Circuit has applied Arn to reports and recommendations in criminal cases. U.S. v. Davis, 300 F. App'x 393, 399 (6th Cir. 2008).

### III. Analysis

All of Zuniga's objections address the Magistrate Judge's determination that Trooper Behnke was a credible witness. The Court is "'statutorily and constitutionally required' to engage in a de novo review" of the credibility of witnesses. United States v. Hampton, 2011 WL 5142984, at *6 (W.D. Tenn. Oct. 28, 2011) (quoting United States v. Burcham, 388 F. App'x 478, 481 (6th 2010)). Although the standard is de novo, courts in the Sixth Circuit are "generally reluctant to set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness and assess his demeanor." Peveler v. United States, 269 F.3d 693, 702 (6th Cir. 2001) (citing Ramsey v. United Mine Workers of Am., 481 F.2d 742, 747 (6th Cir. 1973)). So long as the magistrate judge is in the best position to assess a witness's credibility, courts give deference to the trier of fact. United States v. Hill, 195 F.3d 258, 264-65 (6th Cir. 1999).

### A. Probable Cause for the Traffic Stop

Zuniga objects to the Magistrate Judge's determination that Trooper Behnke's testimony was a credible basis for finding there was probable cause to stop Zuniga. (Id. at 2.) Zuniga contends that "probable cause was necessary for the traffic stop to be constitutional . . . ." (Id.) Zuniga argues that, because Trooper Behnke's testimony was not credible, the Court

should reject the Report and grant his Motion to Suppress. (Objections at 3.) Zuniga cites Trooper Behnke's inability to recall the exact section of the Arkansas Code Annotated that Zuniga violated twice. (Id. at 4-5.) Zuniga also argues that Trooper Behnke was operating under pretext when he stopped Zuniga because Officer Bartlett asked Trooper Behnke to stop Zuniga. (Id. at 3.)

A de novo review of the record reveals that the Magistrate Judge was in the best position to evaluate the witnesses' credibility. United States v. Freeman, 412 F. App'x 735, 743 (6th Cir. 2010). The Magistrate Judge found that Trooper Behnke testified that Zuniga occupied two lanes in his truck "in violation of Arkansas' careless and prohibited driving statute." (Report at 8.) The Magistrate Judge also found that Trooper Behnke testified that Zuniga drove outside the fog line, "again in violation of Arkansas' careless and prohibited driving statute." (Id.) The Report acknowledges that Trooper Behnke cited Arkansas Code Annotated § 27-51-304, which addresses one-way roads and traffic islands. (Id. at 8 & n.3.) The Magistrate Judge assumed for the purposes of the Report that Trooper Behnke relied on Arkansas Code Annotated § 27-51-104, which is Arkansas' "Careless Driving" statute. (Id. at n.3.) Trooper Behnke testified that Zuniga violated Arkansas's "careless and prohibited driving statute" twice. (Id. at 8.)

16

That title is very similar to Arkansas' "Careless Driving" statute title. It is clear that Trooper Behnke witnessed Zuniga drive carelessly, which he knew was a violation of Arkansas law. The Court's review of the record is consistent with the Magistrate Judge's observation of Trooper Behnke. After weighing the evidence before her, the Magistrate Judge concluded, and the Court agrees, that Trooper Behnke meant to refer to Ark. Code Ann. § 27-51-104. The record provides "no compelling reason to second-guess the magistrate judge's decision." Peveler, 269 269 F.3d at 702; 412 F. App'x at 743.

Zuniga's argument that Trooper Behnke was acting under pretext is not well taken. The Magistrate Judge concluded, and the Court agrees, that Trooper Behnke's subjective motivations "are not relevant to the inquiry or whether probable cause existed to detain Zuniga for his traffic violations." (Report at 20.) "The Fourth Amendment [] permits an officer who has probable cause to believe that a traffic violation is occurring to detain the automobile, regardless of the officer's subjective motivation for the stop." United States v. Burton, 334 F.3d 514, 516 (6th Cir. 2003) (citing Whren v. United States, 517 U.S. 806, 812-13 (1996)). Trooper Behnke's discussion with Officer Bartlett is not germane to the probable cause determination the Magistrate Judge made. The Court OVERRULES Zuniga's first objection.

## B. Reasonable Suspicion

Zuniga next objects to the Magistrate Judge's reliance on Trooper Behnke's testimony that Zuniga's interaction with Zuniga after he pulled Zuniga over expanded the traffic stop. (Objections at 5-7.) Zuniga argues that Trooper Behnke did not check whether Zuniga's Mexican driver's license was valid. (Id. at 6.) Zuniga contends that an illegal alien is not eligible to obtain an Arkansas license, but no statute makes driving in Arkansas with a valid, foreign license a misdemeanor. (Id.) Zuniga also argues that Trooper Behnke's testimony that he was suspicious that Zuniga was lying when he stated that he did sheetrock work in Memphis is not credible. (Id.)

A de novo review of the record reveals that the Magistrate Judge was in the best position to evaluate the witnesses' credibility. United States v. Freeman, 412 F. App'x 735, 743 (6th Cir. 2010). The Magistrate Judge concluded that, when Trooper Behnke learned Zuniga was an illegal alien, the scope of the traffic stop expanded. (Report at 22.) The Magistrate Judge found that the traffic stop turned into an investigation of Zuniga's driving without a license. (Id.) The driver's license did not bear Zuniga's actual name, but the name Fabian Avila Prieto. (Report at 9-10.) Zuniga provided no evidence that his license was valid. After weighing the evidence before her, the Magistrate Judge concluded, and the Court agrees, that

Zuniga's admission he was an illegal alien was sufficient to expand the scope of the initial traffic stop. The record provides "no compelling reason to second-guess the magistrate judge's decision." Peveler, 269 269 F.3d at 702; 412 F. App'x at 743.

The Magistrate Judge found that there were no sheetrock-specific tools in Zuniga's truck. (Report at 22-23.) Because Zuniga's proof of insurance was issued two days before the traffic stop, Zuniga could only have been in Memphis for one day before July 2, 2013. (Report at 9.) Zuniga's hands were not calloused. (Id. at 11.) Zuniga was also visibly nervous and shaking. (Id. at 9.) After weighing the evidence before her, the Magistrate Judge concluded, and the Court agrees, that all of the circumstances created a reasonable suspicion that the truck was transporting contraband. The record provides "no compelling reason to second-guess the magistrate judge's decision." Peveler, 269 269 F.3d at 702; 412 F. App'x at 743. The Court OVERRULES Zuniga's second objection.

### C. Consent to Search the Truck

Zuniga objects to the Magistrate Judge's determination that Trooper Behnke's testimony that he received valid consent to search the truck was credible. (Objections at 7.) Zuniga argues that because he told Trooper Behnke he only understood a little English and Trooper Behnke knew he was from Mexico and in

the country illegally, Trooper Behnke should have known there was a language barrier. (Id.)

A de novo review of the record reveals that the Magistrate Judge was in the best position to evaluate the witnesses' credibility. United States v. Freeman, 412 F. App'x 735, 743 (6th Cir. 2010). Zuniga presented no evidence that Zuniga's consent was invalid, but "hinted at the issue" when he questioned Trooper Behnke about Zuniga's ability to speak and understand English. (Report at 24.) The interactions between Trooper Behnke and Zuniga took place in English. (Report at 12.) Trooper Behnke testified that he believed Zuniga understood English based on his responses. (Id.) Trooper Behnke testified that Zuniga never stated he did not understand English. (Id.) Defense counsel did not offer any affirmative evidence that Zuniga did not understand English. (Id. at 24.)

Consent to search is voluntary if a suspect's will is not overborne. Schneckloth v. Bustamonte, 412 U.S. 218, 225-226 (1973). There is no evidence that Trooper Behnke overbore Zuniga's will and forced him to consent to the search of the truck. (Report at 24.) There is no evidence that Trooper Behnke attempted to deceive or coerce Zuniga, that consent followed a lengthy detention or interrogation, or that Zuniga did not consent at all. (Id. at 24-25.) After weighing the evidence before her, the Magistrate Judge concluded, and the

Court agrees, that Trooper Behnke's testimony that Zuniga appeared to be able to speak and understand English was credible. The record provides "no compelling reason to second-guess the magistrate judge's decision." <u>Peveler</u>, 269 269 F.3d at 702; 412 F. App'x at 743. Zuniga's consent to search the truck was not involuntary. The Court OVERRULES Zuniga's third objection.

### D. State of the Toolbox Bolts

Zuniga objects to the credibility of Trooper Behnke's testimony that the bolts on the toolbox and external fuel tank were heavily tooled. (Objections at 7.) Zuniga contends that Trooper Behnke did not produce any photos of the bolts. (<u>Id.</u>)

A de novo review of the record reveals that the Magistrate Judge was in the best position to evaluate the witnesses' credibility. <u>United States v. Freeman</u>, 412 F. App'x 735, 743 (6th Cir. 2010). Trooper Behnke testified that the bolts had been used often. (Report at 13.) Trooper Behnke also found a ratchet and socket that fit those bolts. (<u>Id.</u>) Zuniga presented no evidence that the bolts were not tooled. After weighing the evidence before her, the Magistrate Judge concluded, and the Court agrees, that Trooper Behnke's testimony that the bolts were heavily tooled was credible. The record provides "no compelling reason to second-guess the magistrate

judge's decision." <u>Peveler</u>, 269 269 F.3d at 702; 412 F. App'x at 743.  The Court OVERRULES Zuniga's fourth objection.

### E.  Authentication of the Government's Exhibits

Zuniga objects to Trooper Behnke's credibility because he did not take some of the photos introduced as exhibits during the hearing, did not know who took them, and had not seen them before.  (Objections at 7-8.)

A de novo review of the record reveals that the Magistrate Judge was in the best position to evaluate the witnesses' credibility.  <u>United States v. Freeman</u>, 412 F. App'x 735, 743 (6th Cir. 2010).  After weighing the evidence before her, the Magistrate Judge concluded, and the Court agrees, that Trooper Behnke's testimony was credible.  The record provides "no compelling reason to second-guess the magistrate judge's decision." <u>Peveler</u>, 269 269 F.3d at 702; 412 F. App'x at 743. The Court OVERRULES Zuniga's fifth objection.

### IV.  Conclusion

The Court OVERRULES Zuniga's objections and ADOPTS the Report and Recommendation of the Magistrate Judge.  Defendant's Motion to Suppress Fruits of July 2, 2013 Traffic Stop is DENIED.

So ordered this 24<u>th</u> day of June, 2014.

_/s/_Samuel H. Mays, Jr. ____
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE